# United States Court of Appeals
## For the First Circuit

No. 11-2250

IN RE: BOSTON SCIENTIFIC CORPORATION SECURITIES LITIGATION.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Boudin and Thompson,
Circuit Judges.

William H. Narwold with whom Gregg S. Levin, James M. Hughes, William S. Norton, J. Brandon Walker, Motley Rice LLC, Sherrie R. Savett, Barbara A. Podell, Phyllis M. Parker, Berger & Montague, P.C., Leslie R. Stern and Berman DeValerio were on brief for appellants Steelworkers Pension Trust and KBC Asset Management NV.
Robert J. Kaler with whom David Himelfarb, Edward W. Little, Jr. and McCarter & English LLP were on brief for appellees Boston Scientific Corporation, J. Raymond Elliott, Samuel R. Leno, Fredericus A. Colen, and James R. Tobin.

July 12, 2012

**BOUDIN**, **Circuit Judge**.  This case charging securities fraud was brought in the district court as a class action on behalf of a proposed class of shareholders of Boston Scientific Corporation ("Boston Scientific").  Boston Scientific is a large publicly traded company that makes and sells medical devices; it produces numerous products across a range of medical fields, operates in multiple countries and employs over 25,000 people.  The charges made, now common when a company's stock price declines suddenly, rest on the following allegations and background facts.

A substantial portion of Boston Scientific's sales in late 2008 and early 2009--around 30 percent--were of cardiac rhythm management ("CRM") devices handled by a group within the company devoted to such products.  CRM devices are implantable devices that use electric pulses to treat a patient's cardiac condition; they include pacemakers and implantable cardioverter defibrillators ("ICDs").  The devices are typically marketed and sold directly to physicians by Boston Scientific's CRM sales staff, which in the period with which the suit is concerned consisted of about 1,100 employees.

In August 2009, Boston Scientific began an audit of CRM sales expense reports from recent trips of sales representatives who accompanied physician customers on tours of Boston Scientific manufacturing facilities.  Twenty one sales reps were questioned about whether food and entertainment provided exceeded permissible

limits; and in September Boston Scientific received a subpoena from the U.S. Department of Health and Human Services ("HHS"), requesting information about contributions made by CRM to charities with ties to physicians or their families.  Neither the audit nor the subpoena were initially disclosed to the public.

On October 20, 2009, the first day of the class period stated in the later-filed complaint, Boston Scientific announced its results for the third quarter of 2009, and issued a press release noting that although CRM product sales had increased by eight percent during the quarter, the CRM group's level of growth was disappointing.  During a conference with investors and analysts that day, Raymond Elliott (President and CEO of Boston Scientific) and Samuel Leno (Executive Vice President and President of the CRM group) made encouraging statements about CRM sales prospects.

Specifically, the men said that current growth was slower than expected because they had underestimated the time it would take to bring 150 newly hired sales representatives up to normal productivity levels; that the prospect of increased market share existed as the new hires completed training over nine to twelve months; that "[w]e have solid growth in our CRM business, and we have also added a number of people on the sales force on a global basis," and that "the outlook is still positive but mixed as it relates to market growth expectations."

On November 6, 2009, Boston Scientific publicly disclosed the HHS subpoena (a month-and-a-half after receiving it) in a quarterly report filed with the SEC (see note 2, below), noting that "[w]e are currently working with the government to understand the scope of the subpoena." In this same SEC report, the company reiterated the gist of the October remarks of the two officers, predicting that "additional [CRM] sales representatives will generate incremental net sales in future periods."

In either late November or early December 2009, Boston Scientific began to fire some of the twenty-one audited CRM sales representatives. On December 1, Elliott was asked by a moderator during a healthcare conference call what had surprised him so far in his first six months as CEO. He responded,

> I think, Tim, because I've been there a bit as a director, there probably wasn't as many surprises really. But I think the market change probably downward a bit on the ICD side affected sort of our viewpoint in CRM as a bit of a downside.

On December 9 and 10, 2009, an unspecified number of CRM sales representatives were fired. Also on December 10, Boston Scientific filed a registration statement and prospectus with the SEC, announcing a public offering of $2 billion in senior notes. Both the prospectus and a supplement filed on the closing date of the offering, December 14, listed as one of fifty-one factors that could cause actual results to differ materially from forward-

looking statements Boston Scientific's "ability to retain key members of our CRM sales force and other key personnel."

Days earlier, on December 11 or 12, 2009, Boston Scientific fired a Divisional Vice President of Sales of CRM devices, who managed one of three sales regions in the United States and according to the complaint "played a key role in crafting and implementing pricing, sales, marketing, strategy, and other key policies for [Boston Scientific's] CRM devices." The complaint alleged that in all, ten members of the CRM sales force were fired for their "repeated[]" breaches of Boston Scientific's internal code of ethics.

On January 12, 2010, Elliott participated in another healthcare conference call. Although not focusing on the CRM group in particular, Elliott touted Boston Scientific's "stable, large, experienced" and "very successful" sales force. He stated that the "sales execution that we talked about building in the last five or six months is now going out into play" and that "[w]e've already done a ton of work in the last six months to get rid of unnecessary distractions and litigation that goes beyond the norm."

However, about a week before, on January 4, 2010, the Boston Scientific's previously discharged Divisional Vice President had been hired by one of Boston Scientific's competitors, St. Jude Medical. The complaint also stated that "many" of the other nine fired CRM sales group members were also hired by St. Jude Medical.

-5-

On February 11, when Boston Scientific announced its fourth quarter 2009 results, it revealed the firing and St. Jude's subsequent hiring of the CRM sales representatives. Elliott said:

> [W]e didn't like the response of St. Jude Medical to the disciplinary actions we took during December. We exited from our Company several sales representatives and Managers who among other things repeatedly breached our healthcare professional Code of Conduct. St. Jude has chosen to quickly hire many of our departed staff . . . . We cannot control what others do. . . . In the short haul, we will for certain lose sales, but I believe in the long haul we will be held in high regard by those that count for our efforts in the healthcare professionals arena.

On the same day as these remarks, the price of Boston Scientific common stock dropped from $8.29, the closing price on the previous day, to a low of $7.39, and closed down about 10 percent, which the complaint alleged was a "direct and proximate result of the February 11, 2010 pre-opening announcements." Several months later, Boston Scientific said that the disciplinary actions and an unrelated product advisory related to unsafe outcomes in certain CRM devices had led to $16 million globally in lost sales for the first quarter of 2010--a period in which the CRM sales revenue was $538 million.

In May 2010, Boston Scientific responded to a number of inquiries from the SEC regarding Boston Scientific's filing for the first quarter of 2010. One such inquiry was whether the

disciplinary actions had impacted the decline in CRM sales in the fourth quarter of 2009. Boston Scientific stated:

> [T]he aforementioned terminations of 10 sales personnel represented less than one percent of our U.S. CRM sales force and had an immaterial impact on our net sales during the fourth quarter of 2009. We expect we will experience the impact of these terminations during 2010; however, our intent is to replace these positions throughout 2010 and recapture lost revenue in 2011 and beyond. In future filings, to the extent our businesses experience significant changes in revenues from period to period, we will discuss all material factors contributing to these changes.

On April 9, 2010, plaintiffs--a union pension trust and an investment management company--filed the present suit in the district court against Boston Scientific, Elliott, Leno and a third officer on behalf of a putative class of those who had purchased the company's stock during the "class period" of October 20, 2009, to February 10, 2010. The complaint charged securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) (2006), and associated regulations, 17 C.F.R. § 240.10b-5 (2010).

The heart of the complaint was that the already-recounted statements--made on October 20, November 6, December 1, 10 and 14, 2009, and on January 12, 2010--violated the anti-fraud provisions of section 10(b).[1] After further proceedings, the district court

---

[1]The complaint's claim under second section 20(a) is derivative of the section 10(b) claim and needs no separate

-7-

granted the defendant's motion to dismiss, <u>In re Bos. Scientific Corp. Sec. Litig.</u>, No. 10-10593, 2011 WL 4381889 (D. Mass. Sept. 19, 2011), holding that the 2009 statements were not materially false or misleading, while the allegations of scienter as to the January 2010 statement were inadequate.

The named plaintiffs now appeal. Our review of the dismissal is <u>de novo</u> and we assume as true the raw facts as alleged in the complaint and draw reasonable inferences in favor of the side opposing dismissal. <u>García-Monagas</u> v. <u>De Arellano</u>, 674 F.3d 45, 47 (1st Cir. 2012). That solicitude does not extend to the legal conclusions or characterizations, <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 555 (2007), or avoid the statutory requirement that "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

<u>Section 10(b) Obligations</u>. To state a section 10(b) claim, a plaintiff must sufficiently allege "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." <u>Miss. Pub. Employees' Ret. Sys.</u> v. <u>Bos. Scientific Corp.</u>, 523 F.3d 75, 85 (1st Cir. 2008). The

discussion. <u>ACA Fin. Guar. Corp.</u> v. <u>Advest, Inc.</u>, 512 F.3d 46, 67-68 (1st Cir. 2008).

district court, as already noted, found that the challenged 2009 statements failed the first requirement and we begin our discussion with them.

Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011); accord Hill v. Gozani, 638 F.3d 40, 57 (1st Cir. 2011). Instead, it extends to omissions only where affirmative statements are made and the speaker fails to "reveal [] those facts that are needed so that what was revealed would not be so incomplete as to mislead." Hill, 638 F.3d at 57 (1st Cir. 2011) (emphasis and internal quotation mark omitted). And the distortion must be "material." 17 C.F.R. § 240.10b-5.

Omitted information is considered material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted). When information merely creates a possibility that an event affecting the company will later occur, materiality

> "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."

-9-

Id. at 238 (quoting SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976 (1969)).

Why companies do not have to disclose immediately all information that might conceivably affect stock prices is apparent: the burden and risks to management of an unlimited and general obligation would be extreme and could easily disadvantage shareholders in numerous ways (e.g., if a new invention were prematurely disclosed to competitors or a take-over plan to the target company). So the securities laws forbid false or misleading statements in general but impose more specific disclosure obligations only in particular circumstances.[2]

The October 20, 2009, statements. Given the materiality threshold, the October 20, 2009, statements, which predicted a "positive but mixed" outlook in CRM sales while noting the continuing training of the 150 new sales representatives, were not false or misleading. The shareholders argue that the statements were misleading because they failed to inform investors that the future outlook was further "mixed" because of the "imminent" firings of the audited personnel.

---

[2]Pertinently, under statutory authority, 15 U.S.C. § 78m(a), the SEC requires annual and quarterly reports providing specified information, including financial statements and risk factors, Form 10-K; Form 10-Q, and disclosure of especially important events whenever they occur, Form 8-K; notably, this last form does not require disclosure of personnel changes other than ones involving a director or principal officer. Form 8-K, Item 5.02.

But the firings were over a month away, and the complaint itself states that the internal investigation (which began in August) was still "ongoing." Not only was the outcome uncertain-- eventually only 10 sales representative were removed while 150 new ones were being hired--but the total number of those being interrogated represented only about two percent of the CRM sales force, and CRM sales themselves were only a portion of the company's business.

The November 6, 2009, statement. This statement, after disclosing the HHS subpoena and harking back to the hiring of 150 new sales representatives, repeated the company's view that "additional [CRM] sales representatives will generate incremental net sales in future periods." Although the audit and investigation had been completed, there is no indication that the company had at this time decided to fire anyone, let alone enough individuals to dent the prospects of more revenues down the line from 150 new hires.

Also insufficient is the challenge to the other November 6, 2009, statement alleged to be materially misleading, namely, that "[w]e are currently working with the government to understand the scope of the [HHS] subpoena." The plaintiffs make no attempt to explain why this bland statement is misleading; and it surely is not rendered incomplete or a "half-truth," Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st. Cir. 1990), by the failure to mention

the internal audit based on the company's internal ethics code and pertaining to a different set of sales practices.

December 1, 2009, statement. The next statement alleged to be materially misleading was Elliott's December 1, 2009, answer to a moderator's question that there had not been that many "downside surprises" since he had become a CEO other than reduced revenues of certain CRM devices. Even if a limited number of firings had now occurred, Elliott was not asked to disclose every possible negative in recent history but merely asked what had surprised him.

So while the audit process was further along, the connection between the general affirmative statement and the specific audit is much weaker. And anyway, the possible or imminent discharge of a tiny fraction of sales personnel for a single line of products remains of minimal expected consequence for a company with global operations and 25,000 employees. This is not even close to the level at which other cases have found omissions to be material.[3]

---

[3]E.g., Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1313-14 (2011) (finding material evidence of a link between a drug company's leading product and loss of smell); In re Cabletron Sys., Inc., 311 F.3d 11, 36 (1st Cir. 2002) (finding material failing to reveal major delays in a company's important new product after creating impression that the product was already available); Aldridge v. A.T. Cross Corp., 284 F.3d 72, 79-80 (1st Cir. 2002) (finding material to revenue figures the failure to reveal policy requiring refunds to previous buyers in the event of a price cut--which the company had already planned to institute).

December 10 and 14, 2009, statements. Both at the beginning and end of a public offering period, on December 10 and 14, 2009, Boston Scientific listed as one of over 50 factors that could cause actual results to differ materially from forward-looking statements the company's "ability to retain key members of our CRM sales force and other key personnel." Plaintiffs say that this was misleading because it omitted to say that by this time about ten CRM sales personnel had been fired, including one in a relatively senior position.

That ten representatives out of 1,100 had been fired while 150 new ones were being trained does not amount to material information; but it is a closer call whether this is so of the loss of one of three of the CRM group's Divisional Sales VPs. Yet it was the personal relationship between sales personnel and doctors that created the main risk that those fired would take business with them and the number of discharged representatives was still surpassingly small.

That the Divisional Vice President would defect to a competitor and take other discharged salesmen with him was not plainly foreseeable. Those discharged for violating the company's ethics codes could well have been regarded as tainted; and that a cadre would reappear at a competitor, recruited in part by the fired Divisional Vice President, came as a surprise to Elliott

-13-

himself, as his February 11, 2010, statement made clear. Nor is the eventual impact of the discharges clear even today.

The plaintiffs make much of the fact that Boston Scientific predicted lost sales of $100 million in its February 11, 2010, conference call and $100 million sounds like a large number, but, in that same conference call, Boston Scientific projected 2010 revenues of $8.1 billion to $8.5 billion, making the projected loss just over one percent of revenues and not necessarily a permanent loss of business. Also, Boston Scientific attributed the $100 million <u>both</u> to the lost salespeople and an unrelated product advisory.

The product advisory, issued December 1, 2009, informed physicians that several patients had suffered unsafe outcomes (such as shocks) from certain CRM devices implanted subpectorally. Although the company did not reveal how much of the $100 million was attributable to the product advisory, this advisory surely caused a portion of the expected losses. In any case, an undisclosed speculative chance of an event that affects only a very small proportion of revenues is not material.

<u>Scienter Requirements</u>. Section 10(b) is a fraud statute whose scienter element is satisfied if the speaker acted with fraudulent intent or knowing or reckless disregard of his obligation to disclose. <u>Auto. Indus. Pension Trust Fund</u> v. <u>Textron, Inc.</u>, No. 11-2106, 2012 WL 2038098, at *4 (1st Cir. June

-14-

7, 2012).  And claims of scienter are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), enacted "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

One reason why securities class actions "pose a special risk of vexatious litigation," Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 86 (2006),  is that the cost of defending, coupled with potentially enormous liability, may make it advisable for the defendant to settle even unlikely or frivolous claims. S. Rep. No. 104-98, at 9 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 688; see also Bohn & Choi, Fraud in the New-Issues Market: Empirical Evidence in Securities Class Actions, 144 U. Pa. L. Rev. 903, 979 (1996).

Further, the normal recovery for class members is extremely modest, see Coffee, Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534, 1545-46 (2006), and the costs of both the company's defense and what it pays in large legal fees to plaintiffs' counsel is usually borne indirectly by the stockholders of the defendant company.  What Congress discerned among the abuses was

> the routine filing of lawsuits . . . whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and . . . the abuse

-15-

> of the discovery process to impose costs so burdensome that it is often economical for the victimized party [i.e. the defendant] to settle.

H.R. Rep. No. 104-369, at 31 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730 (Conf. Rep.). And in response Congress adopted in the PSLRA two pleading requirements aimed at permitting early termination--before discovery--of such "routine filings" of unpromising cases.

First, the PSLRA requires a plaintiff alleging a misleading statement or omission to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. 78u-4(b)(1). Second, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. 78u-4(b)(2) (emphasis added). Taken together, the requirements make it easier to identify the issues and to dismiss flawed complaints at the complaint stage.

The January 2010 Statements. As earlier described, Elliott made several statements at the January 2010 healthcare conference call favorable to the company's sales, including a claim that it had a "stable, large, experienced" and "very successful" sales force. Plaintiffs argue that by this time not only were the firings complete, but at least one, and perhaps more, of the fired employees had been re-hired by one of Boston Scientific's competitors. Yet no mention was made of these facts.

-16-

Neither this nor the other statements supporting the company's sale force focused on CRM sales personnel; but the next month, February 2010, when Boston Scientific finally announced the firings and subsequent hirings of some of the reps by St. Jude, it predicted lost sales as a result. The district court found material the failure to disclose the threat in January 2010 (which we will assume to be correct), but also found the statement non-actionable for lack of adequate allegations of scienter.

The PSLRA requirement that a "strong inference" of scienter be pled requires the complaint to set forth facts making the inference of scienter "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Thus, when Elliott spoke blandly but favorably in January 2010 of the strength of the company's sales force, the facts pled had to provide a clear indication that he was either dishonest or reckless in not mentioning the defection of up to ten salespeople to a competitor.

In cases where we have found the pleading standard satisfied, the complaint often contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital

-17-

information or at least were warned by others that this was so.[4] No such direct evidence is pled in the complaint here. The plaintiffs do not identify any other basis for imputing such wrongful intent, nor was the omitted information of such powerful importance that wrongful intent can reasonably be inferred.

The ten salespeople fired were less than one percent of Boston Scientific's U.S. CRM sales force and an even smaller percentage of the overall sales force of which Elliott was speaking in January 2010. Although a month later the company predicted losses from the firings, the estimation was just over one percent of the company's total projected revenues, and (as explained above) represented the combined effect of both the firings and a negative product advisory.

The delay is consistent with the fact that at the time of the January 12, 2010, statements, some or all of the fired employees had only very recently been hired by St. Jude, and how much business they might take with them surely required some period to assess. Cf. Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful."). As we stated in New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., a company

---

[4]For example, in In re Cabletron, the plaintiffs alleged that the company booked entirely fictitious sales, and employees stored the unsold goods at their homes "at the behest of" the company's chairman. 311 F.3d at 25.

may behave "irresponsibly" if it issues an ominous warning about an uncertain risk that "had not yet been adequately investigated." 537 F.3d 35, 58 (1st Cir. 2008).

In fact, the complaint does not even squarely allege that the individual defendants knew on January 12, 2010, that St. Jude had hired some Boston Scientific salespeople, and that cannot be merely assumed. Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998). Recently, where a company omitted mention of its weakened backlog, scienter was found lacking because "[n]othing in the complaint suggest[ed] that any of the named officers believed, or was recklessly unaware" of the problems. Textron, No. 11-2106, 2012 WL 2038098, at *4.

In all events, even if Elliott knew of the St. Jude hirings, this was at best marginally material for reasons already indicated, and its marginal materiality not only defeats any independent inference of deliberate withholding but also makes the pled facts insufficient for a fact finder to find the "extreme recklessness in not disclosing the fact" that is the least that is required to establish scienter. City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011).

The plaintiffs argue that the district court erred by failing to consider their arguments for scienter "holistically," as Tellabs suggests is proper. 551 U.S. at 326. True, allegations

that are individually insufficient can sometimes combine together to make the necessary showing. To take the simplest example, one known episode of an adverse drug reaction might be meaningless; an undisclosed collection of repeated and serious adverse reactions might permit an inference of conscious wrongdoing or recklessness because the adverse implication is so obvious.

But in this case, a single central risk existed--that sales personnel might leave and perhaps take some of their business with them. This risk became greater with succeeding events to the point that, by January 2010, it was (in the district judge's plausible view) sufficient that the failure to mention it was a material omission. But, even so, it was a single risk with a single potential consequence, namely, real (but quite possibly temporary) losses while new Boston Scientific salespeople pursued the same doctors.

If the likely magnitude of the loss was great in relation to company revenues, and had been so understood by defendants, a basis would likely exist for concluding that they were dishonest or at least reckless in failing to mention it. Because the losses, thereafter identified to the SEC, were extremely modest in relation to revenues and partly attributable to a different cause, no such inference exists. Thus, the January 2010 statements do not pass the PLSRA's heightened pleading standard for scienter.

-20-

Inherent in the PLSRA is the risk that dismissal on the complaint will leave without remedy some wrongs that discovery or trial might have disclosed, albeit a risk Congress thought necessary. Confining ourselves to the pleadings, as we must, there is clearly insufficient basis to find materiality as to all but the last of the statements or infer scienter as to the last.

<u>Affirmed</u>.