# United States Court of Appeals
## For the First Circuit

No. 20-1857

JORGE PONSA-RABELL; CARINA PEREZ-CISNEROS ARMENTEROS; MARILU
CADILLA-REBOLLEDO, by herself and on behalf of her children's
accounts,

Plaintiffs, Appellants,

YGRC MINOR CHILD; CIRC MINOR CHILD

Plaintiffs,

v.

SANTANDER SECURITIES LLC; SANTANDER BANCORP; SANTANDER HOLDINGS
USA, INC.; BANCO SANTANDER PUERTO RICO; BANCO SANTANDER, S.A.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Chief U.S. District Judge]

Before

Thompson and Howard, Circuit Judges,
and Woodcock,[*] District Judge.

Eric M. Quetglas-Jordan, with whom José F. Quetglas-Jordán,
Quetglas Law Offices, and Quetglas Law Firm, P.S.C. were on brief,
for appellants.
Francesca Eva Brody, with whom Andrew W. Stern, Nicholas P.
Crowell, James O. Heyworth, Sidley Austin LLP, Néstor M. Méndez,
Jason R. Aguiló Suro, and Pietrantoni Méndez & Alvarez LLC were on

_____

[*] Of the District of Maine, sitting by designation.

brief, for appellees.

<hr>

May 20, 2022

<hr>

**THOMPSON, Circuit Judge**. Before us is a dispute between brokerage customers of Santander[1], who, lacking a crystal ball, purchased special Puerto Rico securities during a recession in Puerto Rico, but before the crash of the bond market. These purchasers (we'll refer to them as the "Ponsa-Rabell plaintiffs" or "plaintiffs" hereafter) brought a securities class action against Santander asserting claims under federal securities laws and Puerto Rico law. The district court adopted the Report and Recommendation of the magistrate judge, dismissing all claims. On appeal, the Ponsa-Rabell plaintiffs dispute only the federal securities claims (more on that later). Our take, reviewing with fresh eyes, is that the district court got it right, so we affirm.

## BACKGROUND[2]

The Ponsa-Rabell plaintiffs purchased Puerto Rico Municipal Bonds (PRMBs) and other securities heavily concentrated

---

[1] In an effort to declutter the opinion of hard-to-remember abbreviations, the defendants-appellees here will be collectively referred to as "Santander." The parties named in the complaint are Santander Securities, LLC (SSLLC), Santander Holdings USA, Inc. (SHUSA), Banco Santander, S.A. (BSSA), Santander Bancorp (Bancorp), and Banco Santander Puerto Rico (BSPR). Bancorp and BSPR were substituted for FirstBank Puerto Rico by order of this court on March 30, 2021, pursuant to Fed. R. App. P. 43(b). The Ponsa-Rabell plaintiffs have informed this court that the claims subject to this appeal are solely against SSLLC.

[2] All facts are taken from the complaint and accepted as true on a motion to dismiss, and we disregard any conclusory allegations. O'Brien v. Deutsche Bank Nat'l Tr. Co., 948 F.3d 31, 35 (1st Cir. 2020). We may also consider documents attached to the complaint and incorporated by reference therein. Id.

in PRMBs, including Puerto Rico Closed End Funds (PRCEFs) and Puerto Rico Open End Funds (PROEFs) (to avoid overcomplicating things, we'll refer to them collectively as "PRMB securities") from December 1, 2012, to October 31, 2013 (the "Class Period"). PRMBs are bonds used by the Puerto Rican government to finance their "commercial operations." Buyers of the PRMBs loan the issuer money in exchange for a set number of interest payments. Issuers guarantee payment of the monthly yield and principal by a certain maturity date.

The PRMB securities were marketed to the public through prospectuses that were specific to each fund. The prospectuses (also called offering statements or official statements) disclosed the fund's investment objectives, risk factors, and tax consequences, among other useful information. Relevant to this dispute, these prospectuses included specific sections that clearly described the investment risks attendant to investment in each particular fund. Despite the potential risks, the PRMB securities were attractive investments for Puerto Rico residents for some years, as they generally offered higher interest than comparable investments and were exempt from Puerto Rico and U.S. income and estate taxes.

Prior to and throughout the Class Period, Puerto Rico was experiencing an economic recession. Given the nature of the PRMB securities (as we just discussed), investing in them during

- 4 -

a recession was risky. As of December 2012, the PRMB securities' funds were highly concentrated in PRMBs and highly leveraged. This is because during the recession, Puerto Rico issued billions of dollars in PRMB securities, which it used to pay off existing debts, or as the complaint complains, used "debt to pay debt." The sales of PRMB securities were not used to help stimulate (or in this case, revive) the Puerto Rican economy "or alleviate its social needs." During the Class Period, Puerto Rico's deficit increased to approximately $2.2 billion, and eventually, those debts became unpayable.

In 2012, various public sources began issuing warnings about the increasing risks attendant to holding PRMB securities. The complaint helpfully provides some examples of information that was in the public sphere regarding Puerto Rico's economic shakiness. This includes: a March 2012 Breckinridge Capital Advisors report that warned Puerto Rico was "flirting with insolvency" and that someday the Commonwealth may be unable to repay its debts; the fact that on August 8, 2012, Moody's Investor Service ("Moody's") lowered Puerto Rico's general obligation ("GO") bond credit rating to Baa1, raised concerns about outstanding government debt, and advised that "[c]onservative investors with concentrated exposure to any single borrower in the municipal market should pursue portfolio diversification"; and, on December 13, 2012 (just days after the Class Period begins),

- 5 -

Moody's downgraded Puerto Rico's credit rating again to Baa3, just above junk bond status (i.e., not "investment grade").

As previewed by these public statements on the overall infirmity of the Puerto Rico economy in 2012 and 2013, so too was the municipal bond market suffering, exemplified by a period of heightened volatility, rising yields, and downward pressure on the price of PRMBs. The bond market eventually crashed in the fall of 2013, resulting in financial losses for all those who invested in PRMB securities.

Because Santander knew that the PRMB securities were risky, it actively tried to rid itself of its inventory. When Moody's downgraded Puerto Rico's GO rating to Baa3 (i.e., basically junk bond status), Santander began reducing its PRMB securities inventory at a more rapid clip because of its concern of risk exposure given the direction of the market. While Santander was ridding itself of PRMB securities, it was also selling them to the Ponsa-Rabell plaintiffs. By October of 2013, the market for PRMB securities had crashed. In the meantime, Santander managed to reduce its PRMB inventory from $35 million to $105,000, and its PRCEF inventory from $9.2 million to $6.8 million. The Ponsa-Rabell plaintiffs weren't as lucky, and suffered severe economic losses following the crash. Their complaint alleges that had the risks of investing in the PRMB securities been disclosed by Santander, they would have never purchased PRMB securities.

Santander replies that all risks were adequately disclosed to the Ponsa-Rabell plaintiffs by Santander, and that the investment risks they complain of were generally known to the public.

**HOW WE GOT HERE**

Four years after the bond market crashed, the Ponsa-Rabell plaintiffs filed their initial complaint against Santander. They have amended their complaint a few times, leaving us with what they style the Third Amended Complaint (for our purposes, just the "complaint"). In broad strokes, the complaint alleges that Santander devised a "scheme to defraud" investors into purchasing the PRMB securities by omitting information about the state of the market (and thus the riskiness of the investment), and about its own program to rid itself of PRMB securities, in violation of Section 10(b) and Rule 10b-5 of the Exchange Act of 1934 (the "securities claims"). In addition to the securities claims, the Ponsa-Rabell plaintiffs also brought claims under Section 17(a) of the 1933 Securities Act and Puerto Rico law.[3]

---

[3] In addition to the securities claims, the district court's Opinion and Order Adopting Report and Recommendation notes that the Ponsa-Rabell plaintiffs concede that there is no private right of action under Section 17(a). The district court declined to exercise supplemental jurisdiction over the claims under Puerto Rico law. In their appeal, the Ponsa-Rabell plaintiffs briefly state that the district court should exercise supplemental jurisdiction over their state law claims because their federal law claims should not be dismissed. We decline to address this contention not only because it is waived for lack of development (see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)), but also because our decision today is that the federal law claims

Santander moved to dismiss the complaint, and the magistrate judge recommended dismissal. The Ponsa-Rabell plaintiffs filed objections to the magistrate judge's Report and Recommendation, Santander responded in turn, and the district court adopted the Report and Recommendation in its entirety, dismissing the federal law claims with prejudice and the state law claims without prejudice, entering judgment. A notice of appeal timely followed.

## ANALYSIS

At issue here are the Ponsa-Rabell plaintiffs' federal securities claims under Section 10(b) and Rule 10b-5 of the Exchange Act of 1934, which we will explain in more detail (along with each party's position) in just a moment. "We review de novo the district court's dismissal of a securities fraud complaint for failure to state a claim under Rule 12(b)(6)." Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 205 (1st Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[W]e may affirm the dismissal 'on any basis available

_____

fail, and therefore, the supplemental jurisdiction claim must fail, too. See Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 36-37 (1st Cir. 2020). Further, Santander moved to dismiss for lack of personal jurisdiction against BSSA. The district court granted the motion to dismiss as to this claim, and the Ponsa-Rabell plaintiffs do not raise this issue on appeal.

in the record.'"  Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 30 (1st Cir. 2020) (quoting Lemelson v. U.S. Bank Nat'l Ass'n, 721 F.3d 18, 21 (1st Cir. 2013)).

## LEGAL FRAMEWORK

Bear with us as we outline a few legal frameworks that will guide this analysis.  We'll start by previewing the relevant provision of the Securities Exchange Act of 1934.  Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  The accompanying regulation, Rule 10b-5, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  Rule 10b-5 "is coextensive with the coverage of [Section] 10(b)."  S.E.C. v. Zandford, 535 U.S. 813, 816 n.1 (2002).

To successfully make out a Section 10(b) claim, a plaintiff is required to plead six elements:  "(1) a material misrepresentation or omission; (2) scienter [legal speak for knowledge]; (3) a connection with the purchase or sale of a

security; (4) reliance; (5) economic loss; and (6) loss causation." In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017) (citing Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015)). Only the first two elements of the Ponsa-Rabell plaintiffs' Section 10(b) claim -- material misrepresentation or omission and scienter -- are at issue in this appeal. To preview what's to come, because we do not find that the Ponsa-Rabell plaintiffs have pled an actionable omission, we can avoid a lengthy analysis on whether they pled scienter.

"To establish a material misrepresentation or omission, [the Ponsa-Rabell plaintiffs] must show that [the] defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (citation omitted). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015). "Information is material if a reasonable investor would have viewed it as 'having significantly altered the total mix of information made available.'" Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008) (quoting Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996)). We consider the entirety of the relevant facts available at the time of the allegedly misleading statement, not simply the words of the

statement itself.  See In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 75-77 (1st Cir. 2012).  "[I]f an alleged omission involves speculative judgments about future events, materiality will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of [Santander's] activity."  Hill v. Gozani, 638 F.3d 40, 57 (1st Cir. 2011) (cleaned up).  We review that "totality" from the perspective of what Santander knew at the time, meaning "[the Ponsa-Rabell plaintiffs] may not plead 'fraud by hindsight.'"  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 62 (1st Cir. 2008) (quoting Shaw v. Dig. Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996)).

The second legal framework in play comes from the Private Securities Litigation Reform Act (PSLRA), which governs complaints alleging securities fraud (like the one before us).[4]  The PSLRA imposes a heightened pleading standard on complaints alleging securities fraud in order "to curb frivolous, lawyer-driven

---

[4]  The Ponsa-Rabell plaintiffs briefly argue that the magistrate judge imposed a higher pleading standard when reviewing their claims than what is required under the federal securities laws without supporting that contention with law or explaining what they believe to be the appropriate standard of review.  We do not agree with the Ponsa-Rabell plaintiffs, most notably because the argument is underdeveloped and lacks supporting detail.  Zannino, 895 F.2d at 17.  We therefore decline to address that argument at length.

- 11 -

litigation, while preserving investors' ability to recover on meritorious claims." In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 29-30 (1st Cir. 2012) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)). "A plaintiff's complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading' . . . [and] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. at 30 (quoting 15 U.S.C. § 78u-4(b)(1), (2)). "Taken together, the [PSLRA] requirements make it easier to identify the issues and to dismiss flawed complaints at the complaint stage." Id. "[A]lthough 'the PSLRA does not require plaintiffs to plead evidence . . . a significant amount of "meat" is needed on the "bones" of the complaint.'" Ganem, 845 F.3d at 455 (quoting Hill, 638 F.3d at 56). And finally, plaintiffs "must also meet the Rule 9(b) standard for pleading fraud with particularity." ACA Fin. Guar. Corp., 512 F.3d at 58. "[T]he plaintiff must not only allege the time, place, and content of the alleged misrepresentations [or omissions] with specificity, but also the 'factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants.'" Greebel v. FTP Software, Inc., 194

F.3d 185, 193-94 (1st Cir. 1999) (quoting <u>Romani</u> v. <u>Shearson Lehman Hutton</u>, 929 F.2d 875, 878 (1st Cir. 1991)).

With that out of the way, here's our take, which can be summed up by simply saying what a district court colleague said way back when: "[r]ule 10b-5 [and Section 10(b) are] not insurance against an investment loss." <u>Kennedy</u> v. <u>Josephthal & Co., Inc.</u>, 635 F. Supp. 399, 405 (D. Mass. 1985), <u>aff'd</u>, 814 F.2d 798 (1st Cir. 1987). Accordingly, we proceed with dispatch.

## OMISSIONS

In their complaint, the Ponsa-Rabell plaintiffs plead that there were allegedly material omissions (rather than any affirmative misrepresentations on the part of Santander). Generally, an omission is actionable under Rule 10b-5 only where there is an affirmative duty to disclose. <u>Basic Inc.</u> v. <u>Levinson</u>, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Plaintiffs carry the burden of showing "that defendants . . . omitted to state a material fact necessary to make a statement not misleading." <u>Ganem</u>, 845 F.3d at 454 (quoting <u>Geffon</u> v. <u>Micrion Corp.</u>, 249 F.3d 29, 34 (1st Cir. 2001)). "[T]he mere possession of material, nonpublic information does not create a duty to disclose it." <u>Hill</u>, 638 F.3d at 57 (quoting <u>Cooperman</u> v. <u>Individual, Inc.</u>, 171 F.3d 43, 49 (1st Cir. 1999)) (cleaned up). Essentially, in order to get past "go" on a motion to dismiss, a plaintiff must first identify a statement

- 13 -

made by defendants, show how the omission rendered that statement misleading, and finally establish that there was a duty to disclose the omitted information.

In their blue brief, the Ponsa-Rabell plaintiffs take up lots of pages trying get past the go. Through the use of a nifty chart, the Ponsa-Rabell plaintiffs identify two disclosures contained in a fund prospectus generated when the fund was initially offered, which they contend are fatally defective because of information Santander omitted. The disclosures read first: "[t]here is no Assurance that a Secondary Market for the Offered Bonds will Develop" and second "the Underwriters are not obligated to do so [meaning to guarantee a secondary market] and any such market making may be discontinued at any time at the sole discretion of the Underwriters." These two statements are misleading, plaintiffs contend, in light of Santander's failure to disclose a couple of material facts which plaintiffs say were necessary in order to make what facts Santander did disclose not misleading, to wit, the deteriorating market conditions in Puerto Rico and Santander's economic take on those conditions, and second, Santander's failure to disclose that they were ridding their own inventory of PRMB securities and doing so at an accelerated pace.[5]

---

[5] The Ponsa-Rabell plaintiffs seem to allege a laundry list of omissions as the magistrate judge noted, which include: "[t]he events and circumstances in Puerto Rico's economy that led to increased risk in the PRMB market"; "[t]he nature of the risks

- 14 -

The two statements Santander did disclose are misleading in light of the alleged omissions, say the Ponsa-Rabell plaintiffs, because, in a nutshell (as we understand the argument), (1) they were made prior to Santander reducing their PRMB inventory; (2) they were not made at the time they purchased the securities during Class Period; and (3) even if the information that was omitted was public, it did not relieve Santander of its duty to disclose the information to them at the point of purchase. In other words, we take plaintiffs' argument to mean that Santander, by plaintiffs' light, was under an ongoing obligation to update its prospectuses with the information they allege was material (and omitted).

---

involved in purchasing PRMBs"; "[Santander's] concerns about the risks involved in owning PRMBs"; "[t]hat [Santander] had begun reducing its PRMB inventory because of the risks involved in owning such inventory"; "[t]hat Moody's had downgraded Puerto Rico's GO and related debt rating to Baa3"; "[t]hat the Moody's downgrade had further intensified [Santander's] concerns regarding the risks related to PRMBs"; "[t]hat [Santander] accelerated its efforts to reduce its inventory of PRMBs as a result of the Moody's downgrade"; "[t]hat [Santander] was liquidating its inventory of PRMBs because it considered PRMBs too risky"; "[t]hat [Santander] had closed its trading desk to new PRMB purchases and that [Santander] had stopped purchasing PRMBs that its customers sought to sell"; "[t]hat [Santander's] decision to cease purchasing PRMBs could reduce their liquidity"; "[t]he reasons why [Santander] was liquidating its PRMB inventory"; and "[t]hat the risks associated with PRMBs were relevant to the purchase of PRCEFs and PROEFs because they were heavily concentrated and leveraged in PRMBs." Our take is that all of this boils down to two overarching omissions: the state of the economy and its effect on the riskiness of PRMBs, and Santander hastily ridding itself of its PRMB inventory.

- 15 -

Taking the two alleged omissions one by one, we start with the Ponsa-Rabell plaintiffs' claim that Santander should have disclosed to them information regarding the deteriorating market conditions for Puerto Rico bonds. Unfortunately, the Ponsa-Rabell plaintiffs' contention is not in line with our precedent -- and as our colleagues have said, "[i]t is not a material omission to fail to point out information of which the market is already aware." Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004) (citing In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 377 (3d Cir. 1993)). Indeed, the Ponsa-Rabell plaintiffs' own complaint points to public statements about the deteriorating economy in Puerto Rico, quoted supra. Our case law is clear. Santander was simply not under any duty to repeat information already known or readily accessible to investors. See id.

The second alleged omission relates to Santander failing to disclose that it was ridding itself of PRMB securities. They argue that "[i]f the risks were material enough for Santander to divest itself of those securities, they certainly were material enough for it to have a duty to disclose those risks to [plaintiffs] at the time of the purchases."[6]

---

[6] The Ponsa-Rabell plaintiffs spill much ink in their complaint arguing that a duty to disclose can "stem from: the Account and Financial Advisor Agreement; the fiduciary and suitability duties imposed by [the] Securities Exchange Act, FINRA Rule 2111 and Guidelines; the applicable industry standards and regulations; MSRB Rule G-17; the fiduciary duties imposed by PR

- 16 -

In previous cases, we've examined alleged omissions in other securities fraud cases and bucketed them into two categories using the oft-employed "Grand Canyon" metaphor[7]: those where we've considered the "risk [of failing to disclose a material fact] so great that it is akin to the Grand Canyon (and therefore a disclosure is misleading if it frames the risk as merely hypothetical)" on the one hand, and those that "make[] a situation merely risky (i.e., simply a ditch)." Karth v. Keryx Biopharmaceuticals, Inc., 6 F.4th 123, 137 (1st Cir. 2021). There is one case in particular that serves as a foil for the claims brought here, as it deals both with a sudden market downturn and a company ridding itself of securities while selling them to a client. In Tutor Perini Corp., we held that the defendant, Banc of America Securities ("BAS") had a duty to disclose where the risks to the company it was advising, Tutor, had "dramatically

_____

Regulation 6078, Section 25.1; and, the general duties of care and good faith in the performance of a contract established by the Civil Code. . . ." However, the Ponsa-Rabell plaintiffs do not sufficiently plead the existence of any of these duties as it relates to the sale of PRMB securities, and we therefore decline to consider their arguments further.

[7] The "Grand Canyon" metaphor describes "a situation where the broker-dealer makes risk disclosures that, given the market's state, are akin to a hiker 'warn[ing] his . . . companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" Tutor Perini Corp. v. Banc of Am. Sec. LLC, 842 F.3d 71, 90 (1st Cir. 2016) (quoting In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).

- 17 -

changed" when the market for auction-rate securities ("ARS") completely collapsed. 842 F.3d at 87. There, "BAS knew (but elected not to disclose) that the ARS market teetered on the brink of collapse when it encouraged Tutor Perini to snatch up more ARS", all the while shedding itself of the same securities. Id. at 91. BAS and Tutor held a special relationship, where BAS had promised to "provide investment solutions that [met Tutor's] needs by clearly defining the risk/reward of particular securities." Id. at 87 (internal quotation marks omitted). "So, Tutor was more than just a hiker near the Grand Canyon; it was a hiker that had hired BAS as a wilderness guide with the explicit instruction to steer clear of cliffs because of a fear of heights." Karth, 6 F.4th at 137.

Upon a diligent search of plaintiffs' complaint, we've found no allegations of a special relationship, or any particularized investment instructions plaintiffs may have given Santander, that would support a duty to disclose the allegedly omitted information pled by the Ponsa-Rabell plaintiffs, facts that were crucial to our holding in Tutor Perini Corp. The best factual support the Ponsa-Rabell plaintiffs drum up in support of their claims that Santander had a duty to disclose the two allegedly omitted facts are that (1) their purchases were "solicited" (meaning Santander recommended the purchases) and (2) their investment objectives were to "preserve capital" and

"current fixed income." We take their argument to be that because Santander recommended the purchases, knowing at the time of sale that their investment objectives were conservative, Santander was somehow recommending to them an unsuitable investment.[8] Whether or not this assertion is true we cannot determine because the Ponsa-Rabell plaintiffs simply do not plead sufficient allegations allowing us to do so. In Tutor Perini Corp. (in contrast to the Ponsa-Rabell plaintiffs' complaint here), the plaintiffs pled that BAS made a special promise to outline the risks of their investment, and that BAS did in fact know the ARS market meltdown was occurring (i.e., the risks were materializing), and failed to inform Tutor. No such allegations about Santander's actions or inactions are present here.[9] As we earlier explained when describing the legal principles that guide our analysis, a "plaintiff's complaint must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement

---

[8] The Ponsa-Rabell plaintiffs are also wrong in arguing that the magistrate judge erred in noting that the plaintiffs failed to state what kind of investors they were and that the complaint did not specify why the Ponsa-Rabell plaintiffs may have been attracted to the PRMB securities. Neither of these facts have bearing on the outcome, as they are mentioned by the magistrate judge only to illustrate how bare the complaint is of facts.

[9] To be clear, we are not indicating that proof of a special relationship between a securities purchaser and seller is always necessary to establish a Section 10(b) securities violation. Rather, what we are addressing in our analysis here is the Ponsa-Rabell plaintiffs' specific claims as they have chosen to frame them in their complaint.

is misleading' . . . [and] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" In re Bos. Sci. Corp. Sec. Litig., 686 F.3d at 30 (quoting 15 U.S.C. § 78u-4(b)(1), (2)). However, as the magistrate judge so eloquently observed in his Report and Recommendation,

> [h]ere, plaintiffs have not described specific statements by defendants that they wish to challenge. The complaint alleges that [Santander] affirmatively contacted plaintiffs and recommended that they purchase PRMB securities. Presumably, [Santander's] representatives must have made some statement in order to solicit plaintiffs' purchases, for instance, by saying, "I recommend that you purchase these securities." But the complaint provides no details whatsoever regarding the contents of those communications other than to allege that the statements, whatever they were, failed to include certain details.

Bottom line here, while finding oneself in a ditch is no picnic in a meadow, it is also not dining at the edge of the Grand Canyon.

Because we conclude there is no actionable omission, we have no need to address the remaining scienter dispute.[10]

---

[10] Even if the Ponsa-Rabell plaintiffs had managed to identify an omission that rendered a statement made by Santander misleading, nowhere in the complaint do they set forth facts that Santander had knowledge, or scienter, which is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc., 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder et al., 425 U.S. 185, 193-94 & n.12 (1976)). As the Supreme Court has reminded, evidence of fraudulent intent, as required to state a plausible claim under Section 10(b), must be "at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

- 20 -

**CONCLUSION**

Spying no error with the district court's conclusion, and reviewing for ourselves with fresh eyes, we **affirm**.  Each party shall bear its own costs.